## THE STATE v. JAMES J. REDSTRAKE.

1. The intent to defraud is a material element in the crime of uttering forged paper.
2. The placing by the holder of notes with forged endorsements in the bank where they are payable, with direction to the bank officers to present for payment and give notice of protest, followed by actual presentment and notice, will not support a conviction for uttering with intent to defraud, if it appears that the holder knew, at the time, that both maker and endorser had knowledge of the existence and forged character of the paper.

On rule to show cause.

The defendant was indicted for forging, and also for uttering, as true, five several promissory notes.

The first was a note for $800, of the date of October 7th, 1874, drawn to the order of Clement Hall, and signed by Louis M. Hall.

The second was for $800, of the date of October 16th, 1874, drawn in the same form.

The third was for $1000, of the date of October 29th, 1874, drawn in the same form.

The fourth, a note of $6500, of the date of November 10th, 1874, drawn in the same form.

The fifth was for $750, of the date of December 7th, 1874, drawn in the same form.

There was a count in the indictment for forging and procuring the forging of the first-named note.

Then followed a count for uttering and causing the same to be uttered as true, with intent to defraud the said Clement Hall and divers other persons unknown, &c.

Then followed a third count for forging the second note, and a fourth count for uttering the same, and so there were alternate counts for forging and uttering the five notes, making in all ten counts.

The evidence, upon the trial, disclosed the fact that the

name Louis Hall, the maker of these several notes, was written by said Hall, and that the name Clement Hall, on the back, was also written by Louis Hall, without the knowledge of said Clement Hall, who was the father of Louis. Louis, long before maturity, passed these notes to the defendant, James J. Redstrake, with the forged endorsement of the name of the payee, Clement Hall, then upon them.

To sustain the counts for forgery, it was insisted that while the name of the payee was forged by the hand of Louis Hall, yet that such act was counseled, procured and induced by said Redstrake.

To show this, a long course of dealing between Louis Hall and Redstrake was proven, in the course of which a large number of notes, purporting to be of persons in the county, were purchased by Redstrake of Hall, which notes were, by Hall, sworn to have been forged paper. The circumstances under which these and the notes in question were negotiated, were relied upon to show that he, Redstrake, counseled and procured the forgery of the notes named in the indictment.

To sustain the counts for uttering, the same evidence was relied upon to show that Redstrake had a knowledge of the forged character of this paper; that while having such knowledge, he did that which constituted an uttering of the same. It consists in this: The notes were all drawn payable at the banking-house of the Salem National Banking Company. All the notes were, by Redstrake, left at the said bank, before maturity, for collection, with direction to present for payment and to protest. That thereafter demand was made, and the said notes were regularly protested.

The jury found the defendant not guilty upon the counts for forging, and guilty upon the counts for uttering.

Upon motion of the counsel for the defendant, a rule to show cause why there should not be a new trial was entered, and the hearing upon the rule was referred to this court for its advisory opinion.

Argued at February Term, 1877, before BEASLEY, CHIEF JUSTICE, and Justices KNAPP and REED.

For the state, *M. P. Grey* and *A. Browning.*

For the defendant, *W. E. Potter* and *S. H. Grey.*

The opinion of the court was delivered by

REED, J. The primary question in this case is whether, upon the facts proven, this verdict should stand—whether the presentation of these notes to the cashier of the Salem National Banking Company, with direction to present for payment and protest, followed by such presentation and protest, present a state of facts which, upon the assumption that the defendant had a guilty knowledge of their falsity, will support this conviction for uttering and publishing under our statute.

Forgery and uttering is a branch of the more comprehensive crime of cheats, actual or attempted. *Bishop on Crim. Law*, vol. 1, § 423; *vol.* 2, § 498.

As a cheat, it was indictable only when successful. 2 *East P. C.* 825.

When either successful or unsuccessful, the attempt, when made by the fabrication or alteration of certain instruments, was forgery.

By the common law of England, it was supposed to consist in the making or altering a matter of record, or an authentic matter of public nature, as a parish register or deed. As if a man makes a feoffment of lands to J. S., and afterwards makes a deed of feoffment of the same lands to J. D., of a prior date, in order to defraud his own feoffee; or where one is directed to draw a will and inserts legacies therein of his own head; or cuts a name from a letter and writes over the name a general release; or where one makes any fraudulent alteration of the form of a true deed in a material part of it. *Hawkins' P. C.*, vol. 1, p. 335.

Down to the time of Elizabeth, there is no case which extended the scope of the crime of forgery to writings of an inferior degree to those above mentioned.

In the fifth year of Elizabeth, the first statute was passed

concerning forgery and uttering. This statute made it a crime to forge any obligation, or bill obligatory, or acquittance, or release, or other discharge of any debt. It also made it a crime to pronounce, publish, or give in evidence any such false paper as true, knowing the same to be forged.

Although long after that time, in 1727, in the case of *Rex* v. *Ward*, 2 *Strange* 747, it was held that an indictment for forging and uttering an endorsement on the back of a certain certificate was good at common law.

The decision was partly put upon the ground that the statute 5 *Elizabeth*, *ch.* 14, used the word writings in the preamble to the act, in contradistinction to deeds, and so included writings of the class which included the certificate in question.

This decision evidently assumed that the statute of Elizabeth was not intended to extend the crime of forgery and uttering to any new class of instruments, but was intended to impose an additional punishment for the forging of instruments theretofore indictable. The statute *Geo. II., ch.* 25, extended the class of instruments, by express mention, to promissory notes and their endorsement and assignment. It makes the false making of such, with intent to defraud any person whatsoever, or the uttering or publishing as true any such false paper, with intent to defraud, a felony.

By the statute 7 *Geo. II., ch.* 22, this was extended so as to include receipts, acceptances and orders for the payment of money or delivery of goods.

The substance of these three statutes is re-enacted in this state, and now embodied in Section 173 of the revised act for the punishment of crimes.

We observed that forgery and uttering were each either an accomplished or an attempted cheat. A material element, essential to constitute either crime, is a design to affect the rights of another.

As it would be essential, under an indictment for obtaining the property of another by the use of a false or forged paper as true, to show that a fraud was actually accomplished, so under an indictment for forging or uttering, either the

same should be shown, or else an intent to do the same, *Rex* v. *Powel*, 2 *Wm. Bl.* 787; *Rex.* v. *Holden*, 2 *Taunt.* 333.

Whether the statute of 5 *Elizabeth, ch.* 14, was or was not intended to extend the class of writings which might be the subject of forgery, beyond the class indictable at common law, it is clear that it did not change, or intend to change, the character of the elements essential to constitute the common law crime of forgery or uttering.

That act provides that the forgery, as well as the pronouncing or publishing, must be done to the intent that the estate of a freeholder, &c., * * * or the right title in the same shall be molested or troubled, &c.

Says East (5 *P. C.* 854): "The deceitful and fraudulent intent appears to be the essence of this offence, and this is indeed particularly expressed in the statute 5 *Elizabeth, ch.* 14, and in most, if not all, the other acts."

"The nature of forgery," says Hawkins, (*P. C., vol.* 1, *p.* 335,) "does not seem so much to consist in the counterfeiting a man's hand and seal, which may often be done innocently, but in the endeavoring to give an appearance of truth to a mere deceit and falsity, and either to impose that upon the world as the solemn act of another, which he is in no way privy to, or at least to make a man's act appear to have been done at a time when it was not done, and by force of such falsity to give it an operation which in truth and justice it ought not to have."

The language of our act, like the English acts, makes the "intent to prejudice, injure, damage, or defraud any person or persons, body politic or corporate," the material element of the crime of forgery, as well as of uttering the false paper as true. § 173.

The very act of forgery itself will be sufficient to imply an intent to defraud, or, at all events, it will be sufficient if, from the circumstances of the case, the jury can fairly infer that it was the intention of the party to utter the forged instrument. If, however, it appear that no fraud whatever could have been effected by the forgery, then no fraud could

be intended, and the defendant will be entitled to an acquittal. *Arch. Crim. Pl. and Pr., vol. II., p.* \*546.

Where a man erased the word " Libris," and inserted the word " Marcis," in a bond made to himself, it was held not forgery, because the erasure could not be prejudicial to any one but himself, and there was no appearance of a design to cheat. *Blake* v. *Allen, Moore's R.* 619. See also *Bac. Abr., "Forgery," A.*

Tested by this rule, was there that in this case from which the jury could infer a design to defraud ? That the presentation of a note at bank, with a direction to present for payment and protest, followed by such presentment and protest, when the party causing the presentation has a clear knowledge of the falsity of the endorsement, may be an uttering within the statute, I have no doubt.

In most instances it would be so. If the maker of the note had no knowledge of the falsity of the payee's signature, the presentation for payment by order of a person whose only right to payment was derived from the title which such false endorsement was supposed to confer, would be an uttering with intent to defraud. By such presentation he would knowingly assert a right to such paper, with a manifest design to induce the bank, by such false endorsement on behalf of the maker, to pay to an unentitled party the amount of the note, to the clear prejudice of the bank. But in this case the maker was the forger himself. He had full knowledge of the character of the notes, the place where they were payable, and the time at which they matured. He knew they were payable at bank. By a presentation there he certainly could not be deceived as to the character of the paper.

If the note had been presented to him by Redstrake directly, and to save his credit, character and liberty he had paid them, no one would say that the notes were uttered to him as true, or for the purpose of defrauding him by such uttering.

The presentation to the bank, as his agent, could not be

said to be done to defraud him ; nor could it have worked prejudice to the bank, except by an almost impossible combination of circumstances, which required the co operation of the ostensible payee of the notes, a very respectable man, and of Redstrake and Hall, in a conspiracy to defraud the bank, by inducing them to pay money to the wrong party, and then, by the maker afterward repudiating the payment, and the real payee claiming the amount of the notes, or a right to the paper, and so hold the bank responsible for the erroneous payment.

This would involve an inquiry into the manner in which Redstrake procured the paper, if not from the payee ; and if from the payee, how it happened that his signature was forged.

The scheme is too chimerical to receive consideration, and there is nothing in the evidence to show that, by the presentation, any one could have been defrauded by the supposition that the endorsements upon the notes were true.

There was also notice of protest given to Clement Hall, whose name as endorser was forged. This means that he was informed that the note had been presented for payment, and dishonored, and that the holder looked to Hall for payment. Whether this was such an assertion or declaration, that the paper was good, as would amount to an uttering, is not a matter of express authority. The reasoning in the following cases goes far toward supporting such a doctrine: *Commonwealth* v. *Searle*, 2 *Binn.* 332 ; *United States* v. *Mitchell*, 1 *Bald.* 366 ; *Queen* v. *Green*, *Jebb's Cr. Cas.* 281. In the last case the paper was not exhibited, but its contents stated, and the judge held it an uttering.

But whether the act of giving the notice of protest was or was not an uttering, is immaterial, as the facts in the case show no design to cheat, by an assertion of the veracity of the endorsement.

Long before the presentation and notice, Clement Hall knew of the existence of the forged paper. He heard that Redstrake held forged paper against him on December 19th.

Redstrake knew that he had knowledge of their falsity. He wrote the letter to Hall on January 1st. After that date the notes were presented, and notices of protest were sent and received.

There could not have been, in the mind of Redstrake, any design to defraud Hall by an assertion of their genuineness. A design to compel him, Clement Hall, to redeem paper which both he and Redstrake knew to be false, for the purpose of saving his son, would not be an uttering as true.

I think there were no circumstances in the case upon which the verdict can stand, in respect to that element of the crime— an intent to defraud by means of the uttering as true.

There should be a new trial.